**Ali Abdul–Habib HAKEEM, Petitioner,**

v.

**Howard BEYER, Superintendent, Trenton State Prison, and Robert J. Del Tufo, Attorney General of New Jersey, Respondents.**

**Civ. A. No. 90–2243.**

United States District Court,
D. New Jersey.

Sept. 19, 1991.

Ali Abdul–Habib Hakeem, pro se.

Robert J. Del Tufo, Atty. Gen. of New Jersey by Janet Flanagan, Deputy Atty. Gen., Div. of Crim. Justice, Appellate Section, Trenton, N.J., for respondents.

## OPINION

DEBEVOISE, District Judge.

This is an action by petitioner Ali Abdul–Habib Hakeem pursuant to 28 U.S.C. § 2254 for a writ of habeas corpus. For

1. A description of the third perpetrator is not discernable from the record.

the reasons stated below, the petition for a writ will be granted. However, in light of the reservations expressed herein execution of the writ shall be stayed pending appeal.

## STATEMENT OF FACTS

Elois Johnson is the proprietor of the Neighborhood Market Grocery Store located in Newark, New Jersey. During the weeks spanning August 14, 1983 to November 3, 1983, the Neighborhood Market was the target of no less than four armed robberies. On August 14, 1983, the Neighborhood Market was robbed by three individuals, one armed with a small caliber revolver. 2 Trial Transcript at 66–67, *State v. Wooten*, No. 604–2–84 (N.J.Super.Ct. Jan. 16, 1985) [hereinafter "Trans."]. The police were immediately notified and it was determined that between $100 and $200 had been stolen. 2 Trans. at 67; 3 Trans. at 87. Johnson and Joseph Hankerson, a store employee, described two of the perpetrators as black males, one approximately thirty years old, five feet two inches tall, the other approximately fifty years old, five feet six inches tall.[1] 3 Trans. at 94–95. At trial, both Johnson and Hankerson identified petitioner Ali Abdul–Habib Hakeem[2] as the armed perpetrator. 2 Trans. at 66; 3 Trans. at 27.

On September 14, 1983, the Neighborhood Market was robbed by two individuals, one armed with a revolver. 2 Trans. at 66. The police were summoned and it was determined that between $100 and $200 had been stolen. 2 Trans. at 67; 4 Trans. at 4. Johnson described the perpetrators as black males, both approximately 21 years old, one six feet tall, 165 pounds, the other five feet eight inches tall, 140 pounds. 4 Trans at 9. Johnson also emphatically stated that one of these individuals had robbed his store approximately a month earlier. 4 Trans. at 5.

On October 16, 1983, the Neighborhood Market was again the target of an armed

2. During the 1985 trial, petitioner was known by the name Thomas Wooten. He has since changed his name to Ali Abdul–Habib Hakeem.

robbery.[3] Afterwards, the police were called and it was determined that approximately $200 had been stolen. 2 Trans. at 67; 3 Trans. at 98. Johnson described one of the perpetrators as a black male in his forties, standing five feet four inches tall with greying black hair and brown eyes. 3 Trans. at 100. Johnson also stated that this was the same individual who had robbed his store approximately two months earlier. 3 Trans. at 98.

On November 3, 1983, at approximately 2:50 p.m., three individuals, one armed with a sawed-off shotgun, another with a .38 caliber revolver, entered the Neighborhood Market. 2 Trans. at 59, 61. The man armed with the shotgun ordered Johnson and Hankerson to hand over their money and to go to the rear of the store. 2 Trans. at 60–61; 3 Trans. at 28. The police later arrived and it was determined that the perpetrators had taken a red money bag containing between $300 and $400 of currency and food stamps. 2 Trans. at 63; 4 Trans. at 22. After being given a general description of the perpetrators[4] and their getaway car (a black Oldsmobile), the police began a search of the immediate area, achieving negative results. 4 Trans. at 22; Suppression Hearing Transcript at 10, *State v. Wooten, et al.*, No. 604–2–84 (N.J.Super.Ct. Jan. 7, 1985) [hereinafter "Sup.Trans."].

Shortly after their initial investigation, a witness to the crime supplied the police with the license plate number of the car that drove the perpetrators from the scene. Sup.Trans. at 12. A trace of this license plate revealed that the automobile in question was registered to Bennie Roberts of 270 Dayton Street, Newark, New Jersey. The police immediately placed this location under surveillance. Sup.Trans. at 12. At approximately 3:35 p.m., the police stopped a black Oldsmobile in the general vicinity of 270 Dayton Street. Sup.Trans. at 13; 4 Trans. at 24. The car was occupied by three black males, all of whom were or-

dered out of the automobile and held at gunpoint. Sup.Trans. at 13; 4 Trans. at 23. The three individuals were then frisked for weaponry, but none was discovered on their persons. Sup.Trans. 35; 3 Trans. at 47.

The police then began a search of the automobile. On the rear floor of the car, the police discovered a loaded 13 gauge sawed-off shotgun partially covered by a piece of cloth. Sup.Trans. at 35; 3 Trans. at 48. This was the area of the vehicle in which the petitioner had been seated. Sup. Trans. at 15; 4 Trans. at 24. A .38 caliber revolver, loaded with six hollow-point bullets, was also discovered, as was a red pouch and four additional shotgun shells. Sup.Trans. at 37–38; 3 Trans. at 49–50.

The three individuals were then placed in the rear of a police car and taken to the scene of the robbery for purposes of obtaining a positive identification. 3 Trans. at 71–72. Upon arriving at the Neighborhood Market, Johnson and Hankerson were individually asked to view the suspects seated in the rear of the police car. Both positively identified petitioner as one of the persons involved in the robbery. 2 Trans. at 64–65; 3 Trans. at 29–30. The three were then taken to police headquarters for processing. A search of petitioner revealed that he was in possession of $15.10, comprised of both currency and food stamps. Sup.Trans. at 43; 3 Trans. at 53. The two other men were also searched and found to be in possession of $99.20 and $180.75, respectively. Sup.Trans. at 44–45; 3 Trans. at 55–56.

At trial, petitioner vehemently denied his involvement in the crime and raised an alibi defense. He testified that on November 3, 1983, at approximately 2:50 p.m., he was visiting the offices of the Newark Department of Sanitation in hopes of securing future employment. 4 Trans. at 77078. He claimed to have been seen at that loca-

---

3. The record conflicts as to the number of individuals involved in this incident. *Compare* 2 Trans. at 67 (two perpetrators) *with* 3 Trans. at 98–99 (one perpetrator).

4. Johnson stated that he was robbed by a group of three black males. 4 Trans. at 22. He further described one of the perpetrators as a forty-year-old male with grey and black hair who stood five feet-seven inches tall. 3 Trans. at 9.

tion by two receptionists; however, the receptionists were unable to corroborate his account. 4 Trans. at 92–93, 107–108. He also indicated that he did not sign in or otherwise record his presence at this location. 4 Trans. at 79. Thus, no credible proof corroborating petitioner's alibi testimony was adduced at trial.

Petitioner further testified that after this interview he accepted a ride from the two other suspects connected with the November 3, 1983 robbery. 4 Trans. at 81–82. He denied that he ever saw any of the weapons later found in the car and claimed that he was unaware that a robbery had recently taken place. 4 Trans. at 84–86. Petitioner further testified that when he was brought to the Neighborhood Market by the police, neither Johnson nor Hankerson had been able to identify him as one of the perpetrators. 4 Trans. at 86. Petitioner also denied any involvement in any of the preceding Neighborhood Market robberies, 4 Trans. at 90, and stated that he was a forty-six year old light-skinned black male who weighed 127 pounds. 4 Trans. at 90–91. Johnson, however, not only confirmed his out of court identification of petitioner, but testified that petitioner was among the perpetrators of the August 14, September 14, and October 16, 1983 robberies. 2 Trans. at 64–68.

## PROCEDURAL HISTORY

On February 7, 1984, petitioner was indicted by a grand jury in connection with the previously recounted robberies of the Neighborhood Market. The nine count indictment charged petitioner with four counts of armed robbery, *N.J.S.A.* 2C:15–1 [Counts I–IV],[5] aggravated assault, *N.J.S.A.* 2C:12–1(b)(4) [Count V], unlawful possession of a firearm, *N.J.S.A.* 2C:39–5(b) [Count VI], unlawful possession of a sawed-off shotgun, *N.J.S.A.* 2C:39–3(b) [Count VII], possession of a weapon for an unlawful purpose, *N.J.S.A.* 2C:39–4(a) [Count VIII], and unlawful possession of hollow-nosed bullets, *N.J.S.A.* 2C:39–3(f) [Count IX].[6]

On March 7, 1984, petitioner entered a plea of not guilty to all counts of the indictment. On December 11, 1984, petitioner filed a petition for a writ of habeas corpus with the United States District Court for the District of New Jersey. In support of this petition, the petitioner alleged the following grounds for relief: (1) ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, (2) denial of a speedy trial in violation of the Sixth and Fourteenth Amendments, and (3) the imposition of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. The Honorable Frederick B. Lacey, United States District Judge, dismissed this petition without prejudice for failure to exhaust state remedies. *Wooten v. Butler*, No. 84–5134 (D.N.J. Mar. 25, 1985).

On January 7, 1985, the New Jersey Superior Court heard and denied a motion brought by the petitioner to suppress evidence procured during the petitioner's arrest. *State v. Wooten, et al.*, No. 604–2–84 (N.J.Super.Ct. Jan. 7, 1985). On January

---

**5.** Count I refers to the August 14, 1983 robbery; Count II to the September 14, 1983 robbery; Count III to the October 16 robbery; and Count IV to the November 3, 1983 robbery.

**6.** Under New Jersey law, an individual is guilty of armed robbery if "in the course of committing a theft he ... threatens another with or purposefully puts him in fear of immediate bodily injury ... [and] is armed with ... a deadly weapon." *N.J.S.A.* 2C:15–1. The relevant offense of aggravated assault is committed when a person "knowingly, under circumstances manifesting extreme indifference to the value of human life, points a firearm ... in the direction of another...." *N.J.S.A.* 2C:12–1(b)(4). The relevant crime of unlawful possession of a weapon is defined as an individual's "knowingly hav[ing] in his possession a handgun without first having obtained a permit to carry the same...." *N.J.S.A.* 2C:39–5(b). Unlawful possession of a sawed-off shotgun is defined as "knowingly hav[ing] in [one's] possession any sawed-off shotgun...." *N.J.S.A.* 2C:39–3(b). Possession of a weapon for an unlawful purpose is defined as a person's "hav[ing] in his possession any firearm with a purpose to use it unlawfully against the person ... of another." *N.J.S.A.* 2C:39–4(a). Finally, the crime of unlawful possession of hollow-nosed bullets is defined as a person's "knowingly ... possess[ing] any hollow nose ... bullet[s]...." *N.J.S.A.* 2C:39–3(f).

14, 1985, the Superior Court held a *Sands*[7] hearing and determined that all of petitioner's prior convictions would be admissible into evidence to impeach his credibility should petitioner testify at trial. 1 Trans. at 1–8. On January 16, 1985, the Superior Court held a *Wade*[8] hearing and determined that the State's out-of-court identifications of the petitioner would be admissible at trial. 2 Trans. at 14–31.

On January 16, 1985, the petitioner was tried before a jury in the Superior Court. By a verdict rendered on January 23, 1985, petitioner was found not guilty on counts I–III of the indictment. However, the jury did find petitioner guilty on the remaining six counts (IV–IX). On March 7, 1985, the court entered the judgment of conviction and sentenced petitioner to a twenty-five year term of incarceration with twelve-and-a-half years of parole ineligibility on Count IV. A term of eighteen months was imposed on Count V and terms of five years were imposed on Counts VI and VII, each to be served concurrently with the term imposed on Count IV. Petitioner was sentenced to a fifteen year term of incarceration with seven-and-a-half years of parole ineligibility on Count VIII, this term to be served consecutively to that imposed on Count IV. A term of eighteen months was imposed on Count IX to be served concurrently with that imposed on Count VIII. Petitioner's total term of incarceration was reduced by 420 days as credit for time served while awaiting trial.

Petitioner filed a timely appeal, asserting nine grounds of error: (1) the sentences imposed on Counts IV and VIII should run concurrently rather than consecutively, (2) the trial court erred in not merging Counts IV and VIII for sentencing purposes, (3) the trial court erred in not merging Counts V and VI for sentencing purposes, (4) the trial court erred in denying petitioner's suppression motion, (5) the petitioner received ineffective assistance of counsel, (6) the trial court erred in admitting identification testimony that resulted from an unduly suggestive procedure, (7) the trial court erred in proceeding with thirteen, rather than fourteen, jurors, (8) the petitioner was denied his right to a speedy trial, and (9) the petitioner was denied a fair trial due to prosecutorial misconduct. The New Jersey Superior Court, Appellate Division, affirmed the convictions in an unpublished *per curiam* opinion. *State v. Wooten,* No. A–3657–84T4 (N.J.Super.Ct.App.Div. June 30, 1988). Petitioner filed a petition for certification *nunc pro tunc* to the New Jersey Supreme Court which was denied on February 21, 1989. Petitioner then sought post-conviction relief in the New Jersey Superior Court of Essex County, alleging that he was sentenced in violation of the Fifth and Eighth Amendments. This petition was dismissed without prejudice on December 8, 1989 for petitioner's failure to appear. *State v. Wooten,* No. 609–2–84 (N.J.Super.Ct. Dec. 8, 1989).

■ The instant petition followed on June 11, 1990. Petitioner, who is currently incarcerated in the Oregon State Penitentiary,[9] is proceeding *pro se.* In support of his application, petitioner asserts the following claims for relief: (1) the sentence imposed was violative of the Double Jeopardy Clause of the Fifth Amendment and the Due Process Clause of the Fourteenth Amendment, (2) the trial court admitted evidence obtained in violation of the Fourth Amendment, (3) the state's out-of-court identification procedure was unduly suggestive, and therefore in violation of the Fourteenth Amendment, (4) the trial court failed to excuse a juror for cause and erred in proceeding to trial with thirteen jurors, thereby violating the Due Process Clause of the Fourteenth Amendment, (5) the state engaged in prosecutorial misconduct which

7. *See State v. Sands,* 76 N.J. 127, 386 A.2d 378 (1978).

8. *See United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967).

9. Petitioner is currently incarcerated in Oregon pursuant to an interstate compact agreement between Oregon and New Jersey. Since petitioner's incarceration is pursuant to a New Jersey conviction, the respondents have conceded this court's jurisdiction over the instant petition. *See Braden v. Judicial Circuit Court of Kentucky,* 410 U.S. 484, 485–86, 93 S.Ct. 1123, 1125, 35 L.Ed.2d 443 (1973).

violated the Due Process Clause of the Fourteenth Amendment, (6) the petitioner received ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, and (7) the petitioner was denied a speedy trial in violation of the Sixth and Fourteenth Amendments.

## DISCUSSION

### I. *Exhaustion of State Remedies*

■ Before a federal court will entertain a petition for habeas corpus, the petitioner must exhaust all available state judicial remedies. 28 *U.S.C.* § 2254(b) and (c). *See also Duckworth v. Serrano,* 454 U.S. 1, 3, 102 S.Ct. 18, 19, 70 L.Ed.2d 1 (1981). This provision serves to foster comity between the federal judiciary and the courts of the several states, providing the means of balancing the needs of federalism with the protection of an individual's constitutional rights. *See Granberry v. Greer,* 481 U.S. 129, 134, 107 S.Ct. 1671, 1675, 95 L.Ed.2d 119 (1987). The United States Supreme Court has embraced a rule of "total exhaustion", thereby mandating that a petitioner exhaust his state remedies with respect to every claim raised in his habeas petition. *See Rose v. Lundy,* 455 U.S. 509, 519–20, 102 S.Ct. 1198, 1204, 71 L.Ed.2d 379 (1982). Thus, a petition containing both exhausted and non-exhausted claims must be dismissed. *Id.* at 510, 102 S.Ct. at 1199; *McMahon v. Fulcomer,* 821 F.2d 934, 940 (3d Cir.1987).

Upon review of both petitioner's appellate brief and his petition for certification, it is clear that claims two through seven of the instant petition have been exhausted. However, respondent argues that petitioner's double jeopardy claim has not been previously addressed in the state courts. Respondent concedes that the petitioner has previously objected to the sentence imposed by the trial court. However, in his briefs submitted to the Appellate Division and Supreme Court, petitioner grounded these objections solely upon the tenets of New Jersey law. These briefs cite no federal case law in support of these contentions, nor do they make even passing reference to the federal Constitution's Double Jeopardy Clause. The state argues that since the state courts have not been presented with the opportunity to pass upon these claims, the instant petition should be dismissed under the mixed-petition rule espoused in *Rose v. Lundy.* I disagree.

■ In order for a federal habeas claim to be exhausted, the state's highest court must have had a "fair opportunity to apply controlling legal principles to the facts bearing on [the] constitutional claim." *Anderson v. Harless,* 459 U.S. 4, 6, 103 S.Ct. 276, 277, 74 L.Ed.2d 3 (1982) (citing *Picard v. Connor,* 404 U.S. 270, 276–77, 92 S.Ct. 509, 512–13, 30 L.Ed.2d 438 (1971)). As long as the state courts were provided the *opportunity* to rule upon a claim, their failure to explicitly do so will not affect the exhaustion analysis. *See Smith v. Digmon,* 434 U.S. 332, 333–34, 98 S.Ct. 597, 598–99, 54 L.Ed.2d 582 (1978). In providing the state courts with such an opportunity, petitioner need not "cite book and verse on the federal constitution"; however, he must present the state courts with the "substantial equivalent" of his federal claims. *Picard v. Connor,* 404 U.S. 270, 277–78, 92 S.Ct. 509, 513–14, 30 L.Ed.2d 438 (1971); *see also Santana v. Fenton,* 685 F.2d 71, 74 (3d Cir.1982), *cert. denied,* 459 U.S. 1115, 103 S.Ct. 750, 74 L.Ed.2d 968 (1983). This requirement is satisfied only when the state courts have been exposed to the relevant facts and controlling legal principles set forth in the federal petition for habeas corpus. *See Gibson v. Scheidemantel,* 805 F.2d 135, 138 (3d Cir.1986); *Zicarelli v. Gray,* 543 F.2d 466, 472 (3d Cir.1976) (en banc).

■ There is no question that the facts alleged in support of the instant petition are identical to those previously presented before the New Jersey courts. Moreover, I conclude that the federal constitutional dimension of petitioner's double jeopardy claim was adequately presented to the state courts. In his various appeals before the New Jersey courts, petitioner's sentencing objections were expressly grounded upon state law. However, a review of the case law cited by petitioner reveals that

some of those cases on which he relied invoke the double jeopardy protections afforded by the New Jersey Constitution. *See* N.J. Const., art. I ¶ 11 (1947); *and see, e.g., State v. Davis*, 68 N.J. 69, 83, 342 A.2d 841, 846 (1975), *cited in* Brief for Appellant at 10, *State v. Wooten*, No. A–3657–84T4 (N.J.Super.Ct.App.Div. June 30, 1988). Hence, the State courts were fairly presented with a double jeopardy claim under the State constitution.

Despite the restrictive wording of New Jersey's Double Jeopardy Clause,[10] its scope has long been held to embrace the more expansive double jeopardy protections embodied in the common-law. *State v. Currie*, 41 N.J. 531, 536, 197 A.2d 678 (1964). Consequently, the New Jersey Supreme Court has held the Double Jeopardy Clauses of the state and federal constitutions to be coextensive in both scope and application. *See State v. Farmer*, 48 N.J. 145, 168, 224 A.2d 481 (1966), *cert. denied*, 386 U.S. 991, 87 S.Ct. 1305, 18 L.Ed.2d 335 (1967). Thus, a double jeopardy claim premised on New Jersey law is indistinguishable from a federal double jeopardy claim. *See State v. Sanders*, 107 N.J. 609, 618–620, 527 A.2d 442 (1987); *State v. Dively*, 92 N.J. 573, 578, 458 A.2d 502 (1983).

When the "substance of ... [a] state claim is virtually indistinguishable from the [constitutional] allegation raised in federal court[ ]," the claim will be considered exhausted for purposes of habeas corpus. *Santana*, 685 F.2d at 74 (quoting *Bisaccia v. Attorney General of New Jersey*, 623 F.2d 307, 312 (3d Cir.), *cert. denied*, 449 U.S. 1042, 101 S.Ct. 622, 66 L.Ed.2d 504 (1980)). Given the New Jersey Supreme Court's construction of the State Constitution's double jeopardy protections, I am impelled to conclude that every claim advanced in the instant habeas petition has been fairly presented to the New Jersey state courts.

■ In addition, petitioner's failure to continue his pursuit of post-conviction re-

lief in the State appellate courts will not derail his current petition. Such collateral relief is unavailable in the state trial court when the petitioner raises issues specifically adjudicated upon direct appellate review. *N.J.Ct.R.* 3:22–5. Moreover, a petitioner need not seek such relief when the state courts have declined to adjudicate a claim on direct appeal despite having been given the opportunity to do so. *See O'Halloran v. Ryan*, 835 F.2d 506, 509 (3d Cir.1987); *United States ex rel. Hickey v. Jeffes*, 571 F.2d 762, 764 (3d Cir.1978). As the instant petition is comprised solely of issues presented to the Appellate Division and the New Jersey Supreme Court on direct appeal, these claims could not have been re-adjudicated in a post-conviction proceeding. Therefore, petitioner has exhausted all available state remedies as to all claims advance in the instant petition.

## II. *The Sentence Imposed at Trial and Petitioner's Double Jeopardy Claims*

■ The Double Jeopardy Clause of the U.S. Constitution,[11] binding upon the states through the Fourteenth Amendment, *Benton v. Maryland*, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), embodies three distinct protections: (1) protection from a second prosecution following an acquittal, (2) protection from a second prosecution following a conviction, and (3) protection from unauthorized multiple punishments for the same offense. *See Illinois v. Vitale*, 447 U.S. 410, 415, 100 S.Ct. 2260, 2264, 65 L.Ed.2d 228 (1980) (citing *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 2076, 23 L.Ed.2d 656 (1969)). Petitioner contends that the sentence imposed at trial was violative of the third protection extended by the Double Jeopardy Clause. Though cryptically stated, petitioner grounds this claim on two similar contentions: (1) Counts V and VI should have been considered as one crime, and thus the two counts should have been merged for sentencing purposes and (2) the sentences imposed on Counts IV and VIII

---

**10.** "No person shall, after acquittal, be tried for the same offense." N.J. Const. art. I ¶ 11 (1947).

**11.** "[N]or shall any person be subject for the same offense to be twice put in jeopardy of life or limb...." U.S. Const. amend. V.

should not be allowed to run consecutively because both transgressions stemmed from a single criminal transaction.

■ In the multiple punishment context, the scope of judicial inquiry is limited to determining whether the law-makers intended for a single act to be subjected to multiple criminal punishments. *Whalen v. United States*, 445 U.S. 684, 689, 100 S.Ct. 1432, 1436, 63 L.Ed.2d 715 (1980); *Missouri v. Hunter*, 459 U.S. 359, 367–68, 103 S.Ct. 673, 678–79, 74 L.Ed.2d 535 (1983); *Gillespie v. Ryan*, 837 F.2d 628, 630–31 (3d Cir.), *cert. denied*, 488 U.S. 833, 109 S.Ct. 90, 102 L.Ed.2d 66 (1988). The legislature, not the judiciary, is the governmental body charged with the task of determining the punishments for acts of criminal transgression within the limits prescribed by the Constitution. It is free to craft its laws so that a single act may be properly adjudged as violative of multiple criminal statutes. If an act is determined to be in violation of such laws, the legislature is free to permit the imposition of multiple punishments, each corresponding to a specific criminal infraction. *See generally Whalen*, 445 U.S. at 689–690, 100 S.Ct. at 1436–37. Under such circumstances, the Constitution mandates only that the punishments be imposed pursuant to a single judicial proceeding. *See Grady v. Corbin*, 495 U.S. 508, 110 S.Ct. 2084, 109 L.Ed.2d 548 (1990).

The Supreme Court has established a seminal principle governing the determination of whether a single act is subject to multiple criminal sentences. A single act violates multiple statutes and thus may be punished by imposition of multiple sentence only if "each statute requires proof of an element which the other does not." *Blockburger v. United States*, 284 U.S. 299, 304, 52 S.Ct. 180, 182, 76 L.Ed. 306 (1932). However, the court need only resort to *Blockburger* in cases where the legislative intent is unclear. If the legislature's intent is unambiguous, then the application of *Blockburger* is unwarranted. *Hunter*, 459

U.S. at 368–69, 103 S.Ct. at 679. Once the state courts have concluded that their legislature permits the implementation of multiple punishments for a single act, the federal courts are bound to accept their determination. *See Hunter*, 459 U.S. at 368, 103 S.Ct. at 679; *Gillespie*, 837 F.2d at 631. The United States Supreme Court has held that where

> ... a legislature specifically authorizes cumulative punishment under two statutes, regardless of whether those two statutes proscribe the "same" conduct under *Blockburger*, a court's task of statutory construction is at an end and the prosecutor may seek and the trial court and the jury may impose cumulative punishment under such statutes in a single trial.

*Hunter*, 459 U.S. at 368–369, 103 S.Ct. at 679 (quoted in *Gillespie*, 837 F.2d at 631).

In the instant case, the Appellate Division concluded that New Jersey's legislature intended the petitioner's conduct to be adjudged violative of multiple criminal statutes. *State v. Wooten*, No. A–3657–84T4, slip op. at 8–9. The Appellate Division held that Counts V and VI could not be merged into one chargeable offense because the New Jersey legislature intended aggravated assault (Count V) and unlawful possession of a sawed-off shotgun (Count VI) to be considered separate criminal offenses. The Appellate Division modified the term of incarceration imposed on Count VIII,[12] but affirmed the consecutive terms imposed on Counts IV and VIII, holding that armed robbery (Count IV) and possession of a weapon for an unlawful purpose (Count VIII) constitute separate criminal offenses under New Jersey law. The New Jersey Supreme Court's denial of certification let this determination stand undisturbed as the final disposition of the case on the merits. As this court has no reason disturb the holding by the Appellate Division, petitioner's double jeopardy claim must fail.

---

**12.** The term of incarceration imposed on Count VIII was reduced to a term of ten years with

five years of parole ineligibility.

### III. *Illegally Obtained Evidence*

■ The petitioner contends that the trial court erred in allowing evidence that was obtained in violation of the Search and Seizure Clause of the Fourth Amendment. Specifically, he claims that the arresting officers lacked probable cause to conduct a search of the vehicle in which he was riding on the night of the November 3, 1984 robbery. It is well established that under the exclusionary rule evidence obtained in an illegal search, a warrantless search conducted without probable cause, is inadmissible at trial. *Mapp v. Ohio*, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *see also United States v. Bazzano*, 712 F.2d 826, 832 (3d Cir.1983) (en banc). However, if the State provides a "full and fair opportunity" for the adjudication of Fourth Amendment claims, federal habeas review of these claims is barred. *Stone v. Powell*, 428 U.S. at 465, 494, 96 S.Ct. 3037, 3052, 49 L.Ed.2d 1067 (1976). There is no doubt that the courts of New Jersey have provided such a forum. Indeed, the petitioner has argued this point in the state courts no less than three times. The fact that these courts may have erroneously interpreted the Fourth Amendment is irrelevant, as *Powell* completely bars federal habeas review under such circumstances. *See United States ex rel. Petillo v. State of New Jersey*, 562 F.2d 903, 907 (3d Cir.1977). Therefore, petitioner is not entitled to habeas relief on this claim.

### IV. *Unduly Suggestive Identification Procedure*

At the time of petitioner's arrest, the police asked the victims to identify their assailants from a group of individuals seated in a police car. Petitioner contends that the identification procedure employed by the Newark Police violated the Fourteenth Amendment's Due Process Clause because it unduly emphasized petitioner as a suspect. Moreover, petitioner argues that Johnson's and Hankerson's in-court identifications should have been excluded, as this testimony was not sufficiently independent of the original identification to escape the taint of the allegedly impermissible procedure.

■ The Due Process Clause of the Constitution forbids the use of identification procedures which place inordinate emphasis upon a specific individual. *See, e.g., Simmons v. United States*, 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). However, since "reliability is the linchpin in determining the admissibility of identification testimony," *Manson v. Brathwaite*, 432 U.S. 98, 114, 97 S.Ct. 2243, 2253, 53 L.Ed.2d 140 (1977), the suggestiveness of an identification procedure must be evaluated in light of the totality of the circumstances surrounding it." *Id.* at 104, 97 S.Ct. at 2247–48 (citing *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)); *see also United States v. Conway*, 415 F.2d 158, 163 (3d Cir.1969), *cert. denied*, 397 U.S. 994, 90 S.Ct. 1131, 25 L.Ed.2d 401 (1970). Facts indicating that an otherwise suggestive identification is highly reliable may render the identification admissible. The Supreme Court has given substance and formal structure to this totality requirement by enumerating five factors to be considered when evaluating an identification procedure:

■ the opportunity for the witness to view the criminal at the time of the crime, [2] the witness' degree of attention, [3] the accuracy of the witness' prior description of the criminal, [4] the level of certainty demonstrated by the witness at the time of confrontation, and [5] the length of time between the crime and the confrontation.

*Neil v. Biggers*, 409 U.S. 188, 199–200, 93 S.Ct. 375, 382, 34 L.Ed.2d 401 (1972).

■ Applying these criteria to the facts of the instant case reveals that the admission of the identification testimony did not offend constitutional standards. Both Johnson and Hankerson had an excellent opportunity to view petitioner at the time of the robbery. The crime was committed in broad daylight and the undisguised perpetrator stood not more than a few feet from their victims. 2 Trans. at 60. Moreover, the record indicates that Johnson and Hankerson were attentive during the com-

mission of the crime. 2 Trans. at 59–62; 3 Trans. at 3–4, 29, 34. Following the robbery, Johnson gave the police a reasonably accurate description of the petitioner,[13] and both he and Hankerson demonstrated a high degree of certainty when later asked to identify petitioner as an assailant. 3 Trans. at 72, 74–75. Finally, the questioned identification took place less than an hour after the robbery, thus providing Johnson and Hankerson with an opportunity to identify the perpetrators while the details of incident remained fresh in their minds. Taken as a whole, the out-of-court identification possessed sufficient indicia of reliability to merit its inclusion at trial. Consequently, the in-court identification of Johnson and Hankerson was not "tainted" and was therefore properly admitted. As a result, this claim for habeas relief must fail.

## V. *Jury Composition Errors*

■ Petitioner contends that the trial court's failure to excuse a juror for cause amounted to a due process violation. Specifically, he claims that it was error to admit a juror whose father had recently been the victim of an armed robbery. This claim is without merit. The record contains no evidence to support the contention that one of the jurors' father was the recent target of an armed robbery. Moreover, assuming *arguendo* the veracity of this claim, the record contains no evidence to suggest that petitioner was prejudiced by the inclusion of this juror. "[P]roof of prejudice is generally a necessary ... element of a due process claim[ ]," *United States v. Lovasco*, 431 U.S. 783, 790, 97 S.Ct. 2044, 2048–49, 52 L.Ed.2d 752 (1977), and petitioner has in no way satisfied this requirement.

■ Petitioner's second claim is equally meritless. Petitioner claims that it was an abuse of discretion for the trial judge to proceed to trial with thirteen jurors.[14] It is his contention that he should have been tried before a jury of fourteen. The Constitution does not mandate that an individual be tried before twelve jurors in a criminal case. *See United States v. Smith*, 789 F.2d 196, 205 (3d Cir.), *cert. denied*, 479 U.S. 1017, 107 S.Ct. 668, 93 L.Ed.2d 720 (1986). Thus, it follows that the Constitution does not guarantee a criminal defendant a jury of fourteen. Consequently, this ground for habeas relief must be rejected.

## VI. *Prosecutorial Misconduct*

■ Petitioner claims that the State engaged in prosecutorial misconduct by suppressing exculpatory evidence, knowingly allowing witnesses to commit perjury, and suppressing an essential witness. Petitioner fails to allege with any specificity the foundations for his first two assertions, thus I conclude that these claims are too nebulous to merit further review. In support of his final allegation of prosecutorial misconduct, petitioner contends that the State suppressed the testimony of a specific witness, namely Officer William Logan of the Newark Police Department. However, petitioner's counsel entered into a stipulation regarding Officer Logan's testimony. 4 Trans. at 68–70. Assuming the stipulation did not constitute a valid waiver of petitioner's right to call Logan as a witness, petitioner has not indicated what additional information this witness would have provided and failed to demonstrate that he suffered any prejudice from this stipulation. In the absence of a showing of prejudice, petitioner has failed to establish a cognizable due process violation. *See Lovasco*, 431 U.S. at 790, 97 S.Ct. at 2048–49. Accordingly, this claim is without merit.

## VII. *Inadequate Assistance of Counsel*

The right to counsel in a criminal proceeding has long been recognized as a fundamental right of due process, secured by the Constitution to ensure that a criminal

**13.** Hankerson testified that he did not give the police a description of petitioner following the November 3, 1984 robbery. 3 Trans. at 40.

**14.** New Jersey requires only a jury of twelve in a criminal case, *N.J.Ct.R.* 1:8–2(a), with any alternate jurors to be impanelled at the trial judge's discretion. *N.J.Ct.R.* 1:8–2(d).

defendant will enjoy the full benefits and protections of our adversarial system of justice. *See, e.g., Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932). An attorney's presence, however, is not alone sufficient to save a prosecution from constitutional infirmity. The attorney must be capable of fulfilling the role of advocate, for "the right to counsel is the right to *effective* assistance of counsel." *McMann v. Richardson,* 397 U.S. 759, 771 n. 14, 90 S.Ct. 1441, 1449 n. 14, 25 L.Ed.2d 763 (1970) (emphasis added). The line between effective and ineffective representation is not subject to a "bright-line" demarcation, thus the threshold inquiry has been held to be "whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result." *Strickland v. Washington,* 466 U.S. 668, 685, 104 S.Ct. 2052, 2063, 80 L.Ed.2d 674 (1984).

 In order for the petitioner to prevail on a claim of ineffective assistance of counsel, he must demonstrate: (1) that his attorney failed to meet an "objective standard of reasonableness" in his representation and (2) that absent such representation there is a "reasonable probability" that the trial's outcome would have been different. *Id.* at 688, 695, 104 S.Ct. at 2064–65, 2068–69; *see also Kimmelman v. Morrison,* 477 U.S. 365, 106 S.Ct. 2574, 91 L.Ed.2d 305 (1986). Furthermore, counsel's representation is entitled to a strong presumption of effectiveness, as the reviewing court must temper its urge to judge counsel's performance with the benefit of hindsight. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065. Accordingly, any review of a defense attorney's performance under the Sixth Amendment must take into account the totality of the evidence introduced as well as viewing counsel's performance in its entirety. *See Strickland,* 466 U.S. at 689, 104 S.Ct. at 2065; *United States v. Gray,* 878 F.2d 702, 711 (3d Cir. 1989); *cf. Moore v. United States,* 432 F.2d 730, 736–37 (3d Cir.1970).

Petitioner grounds his Sixth Amendment claim upon counsel's belated efforts in investigating possible alibi witnesses, notably the two receptionists who could have verified petitioner's presence at the Newark Department of Sanitation at the time of the November 3, 1983 robbery.[15] *See* Opinion at 280, *supra.* In this connection, the history of the petitioner's legal representation merits discussion.[16] After his arrest, petitioner was appointed a public defender by the state. Three months later, the state assigned the petitioner a different attorney, Patricia Arons. At their first meeting, the petitioner claims to have informed Arons about the existence of possible alibi witnesses and to have asked Arons to interview the Department of Sanitation receptionists. Petitioner contends that despite his repeated requests, Arons failed to conduct any such interviews. Disgruntled by Arons representation, petitioner discharged her two weeks prior to trial, subsequently retaining private counsel. His final attorney, Vernon Clash, is alleged to have attempted to interview these potential witnesses, but due to the thirteen month lag between the date of the interview and that of the crime, they were unable to corroborate petitioner's account.

Other than petitioner's allegations, the record is devoid of any evidence relating to Arons' pre-trial preparation. When the record does not provide sufficient evidence upon which to adjudicate a claim, an evidentiary hearing may be required. *See*

**15.** Petitioner also contends that counsel should have interviewed his now deceased father in order to obtain a corroborative account of petitioner's version of the facts surrounding November 3, 1983. However, as petitioner does not allege that his father accompanied him to the offices of the Newark Department of Sanitation, he would not have been able to testify that petitioner was in fact at this location at the time of the Neighborhood Market robbery. Consequently, this court will focus its discussion only upon those witness who allegedly were capable of providing exculpatory testimony.

**16.** The substance of this account is contained in the petitioner's supplemental *pro se* brief submitted to the Appellate Division, as well as to this court. *See* Supplemental Brief for Appellant at Ra2, p. 9–10, *State v. Wooten,* No. A–3657–84T4 (N.J.Super.Ct.App.Div. June 30, 1988) [hereinafter "Supp.Brief for Appellant"].

*Bibby v. Tard,* 741 F.2d 26, 30 (3d Cir. 1984). However, an evidentiary hearing is not called for with respect to this asserted ground for relief. Assuming *arguendo* the truth of the facts alleged by petitioner, he is not entitled to habeas relief as a matter of law. *Cf. Townsend v. Sain,* 372 U.S. 293, 313–317, 83 S.Ct. 745, 757–59, 9 L.Ed.2d 770 (1963).

 ■ The threshold question in a claim of ineffective assistance of counsel is whether an attorney's belated investigation of a client's alibi constitutes constitutionally defective representation as defined by *Strickland.* This question must be answered in the affirmative. There is little doubt that an attorney must conduct pretrial investigation of both the law and facts governing her case, for without such knowledge it becomes impossible for her to function effectively as an advocate. *See Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066; *Gray,* 878 F.2d at 711. Thus, a complete failure of an attorney to conduct any meaningful pre-trial investigation will establish, *prima facie,* the first prong of the *Strickland* test. *See Gray,* 878 F.2d at 711; *cf. United States ex rel. Johnson v. Johnson,* 531 F.2d 169, 178 (3d Cir.), *cert. denied,* 425 U.S. 997, 96 S.Ct. 2214, 48 L.Ed.2d 823 (1976). Furthermore, the Third Circuit has elaborated upon this requirement, declaring that "[i]t is the duty of every lawyer to conduct a *prompt* investigation of the circumstances ... relevant to [the] guilt [of his client]." *United States v. Baynes,* 687 F.2d 659, 668 (3d Cir.1982) (en banc) (emphasis added). There can be little question that a nine month delay in investigating an alibi proffered by one's client fails to satisfy the constitutional duty to investigate as defined in this circuit. Proof of such allegation would therefore satisfy the first prong of the *Strickland* test.

However, constitutionally defective representation does not in itself entitle a peti-

tioner to habeas relief. Rather, the defective representation must have adversely prejudiced the petitioner's trial. *See Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067. Moreover, the burden of proof falls upon the petitioner to affirmatively establish such prejudice. *Id.* at 694, 104 S.Ct. at 2068. The facts alleged by the petitioner fail to carry this burden. Petitioner claims that the failure of his former attorney to interview potential alibi witnesses promptly adversely prejudiced his trial. However, he concedes that these witnesses were later interviewed, and that they were then unable to corroborate his version of the events of November 3, 1983. In order to meet the *Strickland* requirement of affirmatively demonstrating prejudice, the petitioner must demonstrate that favorable testimony was excluded, for a showing of prejudice may not be made on speculation about what a witness might have said. *See United States v. Valenzuela–Bernal,* 458 U.S. 858, 867, 102 S.Ct. 3440, 3446, 73 L.Ed.2d 1193 (1982). As the petitioner has admitted that such testimony is not presently forthcoming, he has effectively conceded that he is unable to meet the burden imposed by the second prong of the *Strickland* test.

 ■ Petitioner also argues that his counsel's entering into a stipulation as to the testimony of an absent witness, Officer William Logan, amounted to ineffective legal representation that fell below constitutional standards. 4 Trans. at 68–70.[17] Questions concerning the relevance of evidence generally turn on an attorney's trial strategy, and as such they are entitled to the utmost judicial deference. Indeed, the Third Circuit has emphasized that an attorney's "strategic choices ... are virtually unchallengeable[ ]" upon review. *Gray,* 878 F.2d at 710 (citing *Strickland,* 466 U.S. at 690–91, 104 S.Ct. at 2066). Petitioner has offered no evidence which demonstrates that Officer Logan would be forthcoming with exculpatory testimony. Offi-

---

**17.** Officer Logan was the policeman who took Johnson's description of the petitioner immediately after the November 3, 1983 robbery. In the police report chronicling this description, Officer Logan made no reference to the beard worn by petitioner on the date in question, nor did he make any reference to the theft of food stamps. These facts were the substance of the stipulation agreed to by counsel prior to trial.

cer Logan was one of the officers involved in petitioner's arrest, and counsel's decision to stipulate to the testimony of a potentially damaging witness, when viewed in the context of the totality of the evidence adduced at trial, cannot be said to have been a trial strategy falling "outside the wide range of professional competent assistance." *Strickland*, 466 U.S. at 690, 104 S.Ct. at 2066. Since the facts alleged are insufficient to warrant federal habeas relief, petitioner's ineffective assistance claim must fail.

## VIII. *Denial of a Speedy Trial*

Petitioner contends that he was denied the Sixth Amendment's guarantee of a speedy trial. In pertinent part, the Sixth Amendment provides that "the accused shall enjoy the right to a speedy and public trial...." U.S. Const. amend. VI. This protection is binding on the states through the Fourteenth Amendment. *Klopfer v. North Carolina*, 386 U.S. 213, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967).

In *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court adopted a four-pronged balancing test for the evaluation of speedy trial claims. This fact sensitive approach was deemed necessary because it is "impossible to determine with precision when the right [to a speedy trial] has been denied." *Id.* at 521, 92 S.Ct. at 2187. Under *Barker*, the four factors to be weighed are: (1) the length of the delay, (2) the reason(s) for the delay, (3) the defendant's assertion of the right, and (4) the resulting prejudice to the defendant. *Id.* at 530, 92 S.Ct. at 2192; *see also Government of the Virgin Islands v. Duberry*, 923 F.2d 317, 323 (3d Cir.1991).

The first *Barker* factor presents the court with a threshold inquiry, for a tenable Sixth Amendment claim must be premised on "a delay long enough to be 'presumptively prejudicial.'" *United States v. Loud Hawk*, 474 U.S. 302, 314,

106 S.Ct. 648, 655, 88 L.Ed.2d 640 (1986) (quoting *Barker*, 407 U.S. at 530, 92 S.Ct. at 2192). The length of the delay is calculated from the moment the petitioner is officially accused, *i.e.*, from the date of arrest or the issuance of an indictment, whichever occurs first. *See United States v. MacDonald*, 456 U.S. 1, 7, 102 S.Ct. 1497, 1501–02, 71 L.Ed.2d 696 (1982); *accord Burkett v. Cunningham*, 826 F.2d 1208, 1220 (3d Cir.1987). In the case at bar, petitioner was arrested on November 3, 1983 and brought to trial on January 16, 1985. Thus, his trial was delayed a total of fourteen months. As the Third Circuit has stated, "[a] delay of 14 months is ... not dispositive in and of itself, but is sufficiently lengthy to warrant an inquiry into the other [*Barker*] fact[ors]." *United States ex rel. Stukes v. Shovlin*, 464 F.2d 1211, 1214 (3d Cir.1972). Therefore, an inquiry into the remaining *Barker* factor must be conducted.

The second factor to be weighed is the reason for the delay. The record in this case provides little help in determining why 14 months elapsed between petitioner's arrest and his trial. The Appellate Division found that the delay was due to "investigation and trial preparation." *State v. Wooten*, No. A–3657–84T4, slip op. at 11. This assertion is wholly unsupported by the record.[18] Ordinarily, the factual findings of a state court are presumptively correct, *see* 28 U.S.C. § 2254(d), and a credible challenge to such factual findings is grounds for an evidentiary hearing. In *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963), the United States Supreme Court held, *inter alia*, that an evidentiary hearing is appropriate where "(1) the merits of the factual dispute were not resolved in the state hearing; (2) the state factual determination is not fairly supported by the record as a whole ..." *Id.* at 313, 83 S.Ct. at 757. Here, however, there was *no* valid finding of fact since there was no adjudication at trial or subsequent evidentiary hearing conducted by the State courts on the issue of delay, the results of

---

**18.** In fact, petitioner contends that *no* investigation was made in his case. *See* slip. op., *supra*, at 24–25.

which would be entitled to a presumption of correctness. The Appellate Division was not the trier of fact and its post-hoc characterization of the delay in trying petitioner is wholly without factual support in the record. The State has the burden of proof in demonstrating justification of the delay, see *Barker*, 407 U.S. at 527, 92 S.Ct. at 2190, and, failing to introduce new evidence in support of a purported justification, must rely on those facts supplied in the record. Since no additional evidence justifying the delay has been offered, this court must review the same record that was before the Appellate Division. Accordingly, I find that the statement of the Appellate Division is not entitled to deference under 28 U.S.C. § 2254(d).

The State has not borne its burden of bringing petitioner to trial in a reasonably prompt manner, *Barker*, 407 U.S. at 527, 92 S.Ct. at 2190, and must therefore justify any inordinate pretrial delay. Toward this end, the State has not demonstrated any reason for the delay that may be gleaned from the record, nor has it provided this court with supplementary materials which serve to justify its delay.[19] Petitioner contends that the State intentionally withheld prosecution of petitioner until after the trial of one of his co-defendants, but the record contains insufficient evidence to support this conclusion.[20] There is no evidence in the record, however, which would indicate that any significant portion of the delay was caused by either the petitioner or his trial attorney. In short, a fair reading of the record suggests that the State was simply derelict in its duty to bring the petitioner to trial promptly in accordance with his Sixth Amendment rights.

In *Government of the Virgin Islands v. Pemberton*, 813 F.2d 626 (3d Cir.1987), a trial delay of almost sixteen months was brought about by the trial court's failure to list the defendant's case for trial. The Court of Appeals stated a delay caused by a "neutral reason such as negligence ... [will] be weighed ... against the government[ ]", *id.* at 628, and though negligence does not weigh as heavily as an intentional delay " 'the ultimate responsibility for such circumstances must rest with the government rather than the defendant.' " *Id.* (quoting *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192). The case at bar also appears to have been delayed due to the negligence of the government. Hence, *Pemberton* is controlling.[21] Consequently, the delay factor must be counted against the State, though absent a showing of "bad faith or dilatory purpose" the weight of this factor is mitigated somewhat. *Id.*

The third factor to be considered is petitioner's assertion of his speedy trial right. While the Supreme Court has rejected the

19. *Compare,* for example, in *Government of the Virgin Islands v. Burmingham*, 788 F.2d 933 (3d Cir.1986), the Court of Appeals noted that the "absen[ce] of unjustifiable procrastination by the government" weighed against the defendant's Sixth Amendment claim. *Id.* at 935. *Burmingham* involved a case where the defendant's trial was delayed eighteen months. The court found that three months were due the congestion of the trial docket and remaining delay was attributable to the trial court's seeking clarification on a point of law. These factors justified the delay. However, the State has not provided any evidence that suggests the instant case is analogous to *Burmingham*.

20. In support of this claim, petitioner has enclosed a letter from his attorney (Arons), dated June 30, 1984, which stated that his trial would not commence until the trial of one of his codefendants was concluded. *See* Supp.Brief for Appellant at A3. This evidence alone is insufficient to support petitioner's contention that the State was deliberately delaying his trial.

On the other hand, the information contained in this letter is hardly helpful to establish a justifiable reason for the delay in petitioner's trial.

21. The Third Circuit case law has not adopted the Second Circuit's distinction between deliberate or negligent delay and "institutional dysfunction" whereby extensive delays in the trying of criminal defendants are caused by docket overload. *See Flowers v. Somers*, 853 F.2d 131, 134 (2d Cir.1988), *cert. denied,* 488 U.S. 995, 109 S.Ct. 563, 102 L.Ed.2d 588, *rehearing denied,* 488 U.S. 1051, 109 S.Ct. 887, 102 L.Ed.2d 1009 (1989). The Second Circuit has also emphasized the deliberateness of the delay when assessing prejudice under the *Barker* test to degree not shared by the Third Circuit. *See id.* 853 F.2d at 133. As only decisions of the Third Circuit are controlling in cases before this court, I will follow the approach employed by this circuit in speedy trial cases inasmuch as this murky area of law permits ascertainment of a general method of applying the *Barker* test.

rule that non-assertion of the right constitutes a waiver, *Barker*, 407 U.S. at 528, 92 S.Ct. at 2191; *see also Burkett*, 826 F.2d at 1219, it has emphasized that "failure to assert the right will make it difficult for [petitioner] to prove that he was denied a speedy trial." *Id.* 407 U.S. at 532, 92 S.Ct. at 2193. The record indicates that petitioner did not assert his speedy trial right at the commencement of his trial. However, petitioner has provided the court with a copy of his May 5, 1984 *pro se* motion to dismiss the charges against him on speedy trial grounds and a letter from the trial court indicating its receipt of the motion. Supp.Brief for Appellant at TW–1A, JH–1A. This motion was made after approximately six months, and although a delay of this length is not likely to trigger a constitutional inquiry,[22] an early assertion of the right "is entitled to strong evidentiary weight in determining whether [petitioner] has been deprived of his right to a speedy trial." *Shovlin*, 464 F.2d at 1414. Indeed, the *Shovlin* court gave such weight to an assertion made one month after arrest. Such evidentiary weight, *a fortiori*, should be given to an assertion made six months after arrest where there is at least a colorable argument that petitioner's right to a speedy trial had been infringed.

In addition, petitioner has provided the court with a copy of his October 16, 1984 *pro se* motion to dismiss on speedy trial grounds and a certification of service indicating that the court and his attorney were served with this motion. Supp.Brief for Appellant at TW5. This motion was brought eleven months after petitioner's arrest and sufficient time had elapsed so as

to make this motion a timely assertion of the right that triggered an obligation on the part of the State court to engage in further inquiry under *Barker*. *Cf. Redd v. Sowders*, 809 F.2d 1266, 1272 (6th Cir.1987) (ten months delay of trial on robbery trial was presumptively prejudicial); *Isaac v. Perrin*, 659 F.2d 279, 282 (1st Cir.1981) (ten month delay held sufficient to require further *Barker* inquiry); *Smith v. Mabry*, 564 F.2d 249, 252 (8th Cir.1977), *cert. denied*, 435 U.S. 907, 98 S.Ct. 1456, 55 L.Ed.2d 499 (1978) (ten month delay held sufficient).

In the prior habeas corpus proceeding filed by petitioner, this court found that petitioner's motions to dismiss the indictment against him for Speedy Trial Clause violations had not been received or filed with the Superior Court. *See Wooten v. Butler*, No. 84–5134, slip op. at 2 (D.N.J. Mar. 25, 1985). While it appears that these motions were indeed never filed, the record reveals that, at a minimum, petitioner's May 5, 1984 motion was received by the court as evidenced by a letter from the State court judge indicating that the papers had been sent to petitioner's attorney.[23] While the record here contains no letter from the court confirming receipt of the October 16, 1984 motion, there is a certificate of service indicating that the Superior Court, the Essex County Clerk, and petitioner's attorney were served with the moving papers.

The deficiency in petitioner's unsuccessful attempts to move for dismissal of the charges on speedy trial grounds was that neither the Essex County Prosecutors Office nor the Essex County Criminal Motions Clerk were ever served with either set of

---

**22.** *See United States v. Watson*, 599 F.2d 1149, 1157 (2d Cir.1979), *modified, United States v. Muse*, 633 F.2d 1041 (2d Cir.1980) (en banc), *cert. denied*, 450 U.S. 984, 101 S.Ct. 1522, 67 L.Ed.2d 820 (1981) (holding six month delay insufficient for further *Barker* inquiry); *cf. Wells v. Petsock*, 941 F.2d 253, 257 (3d Cir.1991) (seven months delay in murder case insufficient); *Burmingham*, 788 F.2d at 936 (holding five month delay insufficient).

**23.** Several other *pro se* motions by petitioner were forwarded by the Superior Court to his attorney without further comment. *See* Motion for Reduction of Bail, Superior Court's response

dated April 12, 1984; Second Motion for Reduction of Bail, Superior Court's response dated June 26, 1984; Letter of July 5, 1984 from petitioner to Patricia Arons, Esq. with a copy to the Superior Court, Superior Court's response dated July 10, 1984 (annexed to petitioner's Supplemental Brief to the Appellate Division as Exhibits). In each submission, petitioner complains bitterly of his lengthy confinement without a trial. The State court responded to each of petitioner's written submissions with the same form letter that indicated only that the materials received had been forwarded to his attorney.

motion papers. But the State court's letter to petitioner with respect to the first speedy trial motion does not indicate any procedural defect in the filing of the motion, nor does the record indicate that any petitioner was notified that his motion was rejected for failure to serve the prosecutor's office. Petitioner was never informed that his motions had *not* been filed and was never apprised of any reason *why* they were not. From petitioner's perspective, that of a poor, middle-aged, incarcerated layman proceeding *pro se*, the Superior Court's treatment of his motions could be seen reasonably as a refusal to entertain *pro se* motions and that the Superior Court simply and arbitrarily forwarded the motion papers to his counsel with no intention of reaching the merits of the claim. Also, for all petitioner knew, the motions were filed and pending, having not been informed to the contrary, but that the same lack of promptness that had resulted in the delay in his trial had forestalled a ruling on his motions. Both these possible impressions on petitioner's part are consistent with petitioner's argument before this court in 1985 that the Superior Court had "refused to answer" his motions. *See Wooten v. Butler*, No. 84–5134, slip. op. at 1 (D.N.J. Mar. 25, 1985).

In 1985, Judge Lacey of this court dismissed petitioner's speedy trial claim for failure to exhaust state remedies on the ground that petitioner's motions were never filed with the Superior Court. *See Wooten v. Butler*, No. 84–5134, slip. op. at 2 (D.N.J. Mar. 25, 1985). In assessing the exhaustion of state remedies prior to filing a petition for habeas relief, a petitioner's adherence to state procedural rules for seeking such relief is critical. *See Coleman v. Thompson*, 501 U.S. ——, ——, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640, 669 (1991). Judge Lacey's ruling anticipated the Third Circuit's decision in *Schandelmeier v. Cunningham*, 819 F.2d 52 (3d Cir.1986), where a petitioner's alleged letters to the state court that were not in the

record before the district court and the existence of which was disputed by the state prosecutor were held insufficient to constitute an assertion of the right to a speedy trial under the Sixth Amendment for purposes of exhaustion of state remedies. *Id.* at 54. Here, there is no exhaustion problem since the Appellate Division heard and decided petitioner's speedy trial claim on the merits and did not dispose of it on the ground that it was procedurally barred under State law. *See State v. Wooten*, No. A–3657–84T4, slip. op. at 11. Thus, neither the court's prior dismissal of petitioner's previous habeas application nor *Schandelmeier* are controlling here. The only question presented here is whether, as a matter of *federal* law, petitioner's motions to the Superior Court constitute an adequate assertion of his Sixth Amendment right to a speedy trial under *Barker*.

■■■ A criminal defendant proceeding *pro se* does not have to make a procedurally perfect assertion of his speedy trial rights, but must make a "reasonable assertion" of the right, *Pemberton*, 813 F.2d at 629, that puts the responsible authorities on notice of his Sixth Amendment claim. The Superior Court is ultimately responsible for placing a case on the trial calendar and seeing that it is tried in a reasonably timely fashion. *See id.*, 813 F.2d at 628.[24] Under the circumstances, the State court was adequately apprised of a potential Speedy Trial Clause violation and it apparently abdicated its duty under the Sixth Amendment to try criminal defendants promptly. Accordingly, I find petitioner's pretrial efforts to be sufficient to satisfy his "obligation under *Barker v. Wingo* to make a reasonable assertion of his speedy trial claim." *Id.; compare Schandelmeier*, 819 F.2d at 54 (3d Cir.1986) (Third Circuit held, citing Pennsylvania State court cases, that letters to state court not in the record before the district court were not sufficient to constitute an assertion of the speedy trial right for purposes of exhaus-

---

**24.** Indeed, when Judge Lacey dismissed petitioner's first application for a writ of habeas corpus, he suggested that petitioner refile his motions by serving the State court and the Criminal Motions Clerk—not with the County Prosecutor's Office. *See Wooten v. Butler*, No. 84–5134, slip. op. at 1 (D.N.J. Mar. 25, 1985).

tion of state remedies). Since "[petitioner's] assertion of his speedy trial right is entitled to strong evidentiary weight ...," *Barker*, 407 U.S. at 531, 92 S.Ct. at 2192; *accord Shovlin*, 464 F.2d at 1214, I conclude that the third *Barker* factor weighs heavily in petitioner's favor.

 The final *Barker* factor to be evaluated, the prejudice incurred by the petitioner, is also the most important. *See Wells*, No. 90–3199, slip op. at 12. The Supreme Court has identified three interests to be considered when evaluating the prejudice element of a speedy trial claim: (1) the prevention of oppressive pretrial incarceration, (2) the minimization of anxiety and concern of the accused, and (3) the limitation of the possibility that the defense will be impaired. *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193; *see also Wells*, No. 90–3199, slip op. at 12; *Government of the Virgin Islands v. Burmingham*, 788 F.2d 933, 936 (3d Cir.1986). The Supreme Court has expressly rejected any implication in *Barker* that impairment of the defense is the primary concern of the Sixth Amendment, *United States v. MacDonald*, 456 U.S. 1, 8, 102 S.Ct. 1497, 1502, 71 L.Ed.2d 696 (1981); *and see Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, thus cognizable prejudice can be shown by demonstrating injury to *any* of the delineated areas of concern. *See Moore v. Arizona*, 414 U.S. 25, 26–27, 94 S.Ct. 188, 189–90, 38 L.Ed.2d 183 (1973); *United States v. Dreyer*, 533 F.2d 112, 115, 116 (3d Cir.1976).

 Petitioner has failed to demonstrate any impairment of his defense. He contends that the passage of time has deprived him of potential alibi witnesses by eroding their recollection of relevant events and dates. However, "loss of memory .. is not always reflected in the record ...," *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193, and in such a case cannot be the basis of demonstrable prejudice. Since the witnesses' failure to recall petitioner's whereabouts on the day of the robbery is not attributed in the record to the pretrial delay, petitioner's contention is insufficient to bottom a claim of prejudice to his defense. *See Loud Hawk*, 474 U.S. at 315, 106 S.Ct.

at 656; *Pemberton*, 813 F.2d at 629. Petitioner has likewise failed to demonstrate that he has been subjected to any anxiety beyond that which "is inevitable in a criminal case." *Dreyer*, 533 F.2d at 116. A successful showing of anxiety in this degree would require expert psychiatric testimony, *see id.* at 116–17, and if there were sufficient allegations to indicate that petitioner had suffered psychic injury that was out of the ordinary, an evidentiary hearing on the issue might be appropriate. Petitioner's failure to provide the court with any such allegations or evidence compels the conclusion that petitioner's psychological interests have not been prejudiced by the delay of his trial to an extent that the injury is cognizable under the Sixth Amendment.

However, the record reflects that petitioner was incarcerated for the full fourteen months between his arrest and trial. At sentencing, the trial judge indicated that petitioner had been incarcerated ever since his November 3, 1983 arrest. *See* Sentencing Transcript at 3, *State v. Wooten*, No. 604–2–84 (N.J.Super.Ct. Mar. 7, 1985). Bail was set for petitioner, but he was apparently unable to meet this obligation. *See* Supp.Brief for Appellant at PD–1A, TW–2. Petitioner's *pro se* motions for reduction of bail were to no avail.

One of the goals of the Sixth Amendment is to prevent the state from "serious [interference] with a defendant's liberty," *Barker*, 407 U.S. at 537, 92 S.Ct. at 2195 (White, J., concurring), and one is hard pressed to envision a more serious interference than a lengthy pretrial incarceration without justification. Indeed, in various of the Third Circuit's speedy trial cases decided adversely to criminal defendants, the Court of Appeals has given great weight to the fact that the petitioner was not incarcerated prior to trial. *See, e.g., Pemberton*, 813 F.2d at 629–630; *Burmingham*, 788 F.2d at 937. The Supreme Court has also stressed this consideration and given it substantial weight. For example, in *Loud Hawk, supra,* the court in dismissing defendants' claim of prejudice, relied heavily on the fact that the defendants suffered

no "actual restraints" during the period of delay. *See id.* at 315–316, 106 S.Ct. at 656–57.

In *Burmingham,* the defendant suffered no incarceration prior to his trial. In rejecting a speedy trial challenge to an eighteen month trial delay, the Court of Appeals stressed that the absence of "impairment of the defense, *pretrial incarceration,* or evidence of unusual psychological distress ..." is critical to its finding no prejudice to the defendant. *Burmingham,* 788 F.2d at 937 (emphasis added). Likewise in *Pemberton,* the Court of Appeals rejected a Sixth Amendment challenge to a sixteen month trial delay. Quoting approvingly from *Burmingham,* the Court relied heavily on the fact that the defendant had suffered only one day of pretrial incarceration in rejecting his allegations of prejudice. *See Pemberton,* 813 F.2d at 629.

However, petitioner's situation is categorically distinguishable from these prior holdings on the critical ground that he remained imprisoned for the entire fourteen-months prior to his trial. There can be little doubt that petitioner's fourteen-month imprisonment " 'interfere[d] with his liberty ... drained his financial resources, curtail[ed] his associations, subject[ed] him to public obloquy, and create[d] anxiety in him, his family, and his friends.' " *Moore,* 414 U.S. 25, 27, 94 S.Ct. 188, 190 (quoting *United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971)). Indeed, other courts have found similar periods of pretrial incarceration to be sufficient to merit a finding of prejudice. *See, e.g., Redd,* 809 F.2d at 1272 (ten months of pretrial incarceration held sufficient to establish prejudice); *Cain v. Smith,* 686 F.2d 374, 385 (6th Cir.1982)

(eleven months sufficient); *compare Gray v. King,* 724 F.2d 1199, 1204 (5th Cir.), *cert. denied,* 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984) (ten months insufficient).[25] "[T]he Speedy Trial Clause's core concern is the impairment of liberty ...," *Loud Hawk,* 474 U.S. at 312, 106 S.Ct. at 654, and petitioner has not enjoyed the benefits of this constitutional protection. I am satisfied, therefore, that petitioner has suffered significant prejudice from his fourteen-month term of pretrial incarceration.

The recent Third Circuit decision in *Wells,* 941 F.2d 253 (3d Cir.1991), does not compel a contrary holding. In *Wells,* the court found that a seven month period of pre-trial incarceration did not constitute a violation of the Sixth Amendment's speedy trial guarantee. at 257–58. The court noted that:

> The length of the delay which is presumptively prejudicial and which triggers plenary inquiry into the circumstances surrounding the delay will vary with the particular features of each case. Longer delays can be tolerated, for example, when the crime is very serious or complex. *Barker,* 407 U.S. at 531, 92 S.Ct. at 2192.

> \* \* \* \* \* \*

> For the crime of homicide ... a pretrial incarceration of just over seven months, though long is not intolerably so..... Our system must be deliberate to be just; such deliberateness often requires substantial expenditures of time prior to trial. A pretrial incarceration of seven months, although harmful from the perspective of the accused, does not by itself compel a finding that the peti-

---

25. The *Gray* court rested its holding on the fact that the period of pretrial incarceration was credited to the defendant's sentence, thereby mitigating any prejudice. *See Gray,* 724 F.2d at 1204. However, such a holding directly contradicts concerns expressed by the Supreme Court regarding the evils of pretrial incarceration. *See United States v. Marion,* 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971); *see also* Opinion at 292, *supra.* An individual will find little solace in knowing that his right to a speedy trial can be circumvented simply by applying his period of pretrial incarceration to his sentence upon conviction. The court in *Gray* appears to have disregarded a critical distinction between pretrial and post-conviction periods of incarceration, namely that the former serves to curtail the liberties of those who are *legally innocent.* In this regard, the *Gray* holding serves only to erode the protections embodied by the Speedy Trial Clause. Consequently, I respectfully decline to adopt the Fifth Circuit's rule regarding this issue.

tioner was deprived of his right to a speedy trial.

*Id.* (footnote and citations therein omitted).

In the instant case, the pretrial incarceration stretched to nearly twice the length of time of that at issue in *Wells*. Furthermore, no facts in the record indicate that this extraordinary delay was for the sake of "deliberateness". In contrast, the attorney for Wells *consented* to the delay of the trial date, presumably to ensure more thorough trial preparation and to allow pre-trial publicity to subside. *Id.* at 256. Nothing in the record here reveals that the case before the State trial court was so complex with respect to either the law or the facts that the delay in petitioner's trial was justified thereby. Hence, this portion of the reasoning in *Wells* does not apply to the instant case and does not afford the State an excuse for its dilatory performance of the duty to try a criminal defendant promptly.

The *Wells* court also found that "the seriousness of a deprivation of liberty due to pretrial incarceration will vary with the conditions of the defendant's confinement[ ]," as "the speedy trial guarantee was intended to prevent '*oppressive* pretrial incarceration.' *Barker*, 407 U.S. at 532, 92 S.Ct. at 2193 (emphasis added)." *Id.* at 257–58. The Court of Appeals explained that while seven months of pretrial incarceration was within Constitutional bounds in light of the facts in the record, the duration of Constitutionally permissible incarceration decreases as the conditions of confinement worsen. *Id.* at 257–58.

 While petitioner has not demonstrated extraordinary or substandard conditions of confinement, the length of his incarceration obviates the necessity of such proof. *Wells* does not hold that proof of substandard conditions is necessary for a successful Speedy Trial Clause claim; such a holding would collapse the Sixth Amendment's speedy trial guaranty into the Eighth Amendment's prohibition of cruel and unusual punishment. Rather, "flexible analysis" of the facts in each case permit a court to find what would otherwise be a

legally tolerable length of incarceration to be in violation of the Sixth Amendment. *See id.* Thus, the length of pretrial incarceration defines the outer limit of permissible pretrial incarceration and proof of poor conditions of confinement may serve as an aggravating factor that can reduce the amount of time in prison that suffices to establish a constitutional violation. Accordingly, where the petitioner has been subjected to undue and unjustified delay, the duration of pretrial incarceration alone may suffice as grounds for finding prejudice of constitutional dimensions. Thirteen months of pretrial confinement without any justification warrants a finding of such prejudice.

 The merits of petitioner's speedy trial claim weigh in favor of granting his application for habeas corpus relief. He has suffered a cognizable delay inflicted by the negligence of the State. Moreover, petitioner made an adequate and timely assertion of his Sixth Amendment rights and suffered significant prejudice from the delay of his trial. Applying the *Barker* balancing test to the facts of this case, I conclude that petitioner has been denied his Sixth Amendment right to a speedy trial. Consequently, a remedy must be fashioned to redress the Constitutional injury. The Supreme Court has emphatically stated that when a petitioner is not brought to trial within the temporal constraints of the Sixth Amendment, "the only possible remedy" is the discharge of the petitioner and the dismissal of the indictment. *Strunk v. United States*, 412 U.S. 434, 439–440, 93 S.Ct. 2260, 2263–64, 37 L.Ed.2d 56 (1973) (quoting *Barker*, 407 U.S. at 522, 92 S.Ct. at 2187–88); *accord Burkett*, 826 F.2d at 1220–21. There is no question that this remedy represents an extraordinarily severe sanction, but, as this court has noted, "such severe remedies are not unique in the application of constitutional standards." *Strunk*, 412 U.S. at 439, 93 S.Ct. at 2263. As a result, petitioner's conviction must be overturned, the indictment against him dismissed with prejudice, and his discharge from State custody ordered.

## IX. *The Propriety of a Stay of the Judgment Pending Appeal*

However, the facts of this case counsel that execution of the writ of habeas corpus should be stayed pending appeal. In the United States Supreme Court's decision in *Hilton v. Braunskill*, 481 U.S. 770, 107 S.Ct. 2113, 95 L.Ed.2d 724 (1987), the Court held that the lower federal courts have broad discretion to stay an order granting a writ of habeas corpus and discharging the petitioner from custody. *See* 481 U.S. at 776–777, 107 S.Ct. at 2119–20 (abrogating *Carter v. Rafferty*, 781 F.2d 993 (3d Cir.1986)). Indeed, a district court has even more autonomy and broader discretion to issue stays than the Courts of Appeals, as an appellate court reviewing a trial court's stay must due so with considerable deference. *See United States v. Smith*, 835 F.2d 1048, 1050 (3d Cir.1987) (citing *Hilton*, 481 U.S. 770, 107 S.Ct. 2113, 2119, 95 L.Ed.2d 724); *and see Contractors Association of Eastern Pennsylvania v. City of Philadelphia*, 739 F.Supp. 227, 228 (E.D.Pa.1990).

█ Construing the powers of the federal appellate courts under Rule 23(c) and (d) of the Federal Rules of Appellate Procedure to stay or otherwise condition the release of a successful habeas petitioner pending appeal, the *Hilton* Court ruled that traditional "factors regulating the issuance of a stay" under Federal Rule of Civil Procedure 62(c) (governing issuance of stays by the district court) and Rule 8(a) of the Federal Rules of Appellate Procedure were applicable and consistent with Due Process. *Id.* 481 U.S. at 776, 779, 107 S.Ct. at 2119, 2120–21.[26] Those factors are: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id.* at 776, 107 S.Ct. at 2119 (citations omitted); *see Contractors Asso-*

*ciation of Eastern Pennsylvania*, 739 F.Supp. at 228; *Moorhead v. Farrelly*, 727 F.Supp. 193, 199 (D.V.I.App.Div.1989); *Local 90, United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry v. United Association of Journeymen and Apprentices of the Plumbing and Pipe Fitting Industry*, 692 F.Supp. 434, 436 (M.D.Pa.1988).

The Court expressly endorsed the consideration of the "traditional state concern" of "the petitioner's danger to the community" in making its stay determination. *Id.* 481 U.S. at 778, 107 S.Ct. at 2120. Due regard for this concern serves the interests of comity rather than offends them by injecting the federal courts into the province of the state courts. *Id.* Moreover, a prisoner's potential dangerousness is without doubt a matter of paramount importance to the public and can hardly be excluded from an assessment of the public's interest in granting a stay. *Cf. Moorhead*, 727 F.Supp. at 201 (stay of restraining order would not be vacated where the stay left in force a general curfew imposed over the Virgin Islands in light of recent civil disturbances on the Island and the speculative nature of predicting the effect of dissolution of the stay on the local crime rate).

In applying the traditional balancing test to determine the appropriateness of a stay, the court must recognize the "presumption in favor of enlargement of the petitioner with or without surety, but it may be overcome if the traditional stay factors tip the balance against it." *Id.* 481 U.S. at 777, 107 S.Ct. at 2119. It appears that unless the traditional balancing factors come to rest in equipoise, the traditional stay criteria are controlling and not significantly constrained by the "presumption of enlargement." In addition, a "stay is more likely to be granted where [it] would merely preserve the status quo pending the appeal." *Moorhead*, 727 F.Supp. at 199 (citing C. Wright & A. Miller, Federal Practice and Procedure § 2908 at 334 (1973)); *and see id.* at 201.

---

**26.** Thus, the Court's analysis of a federal appellate court's powers under Rules 23(c) and (d) of the Federal Rules of Appellate Procedure is di-

rectly applicable to the district court's power to issue stays of its orders pending appeal.

Where the State can "demonstrate a substantial case on the merits, continued custody is permissible if the second and fourth factors in the traditional stay analysis militate against the release." *Id.* 481 U.S. at 778, 107 S.Ct. at 2120. In the instant case, the second and fourth factors of the stay analysis strongly favor the State. The notion of irreparable harm in a habeas case where the stay runs against the petitioner is atypical in that the harm to the state's interest is less concrete than those of an applicant for a stay in a traditional civil case.[27] The types of harm considered in the court's analysis generally will take two forms: (1) harm to the "state's interest in continuing custody and rehabilitation pending a final determination of the case on appeal", *id.* at 777, 107 S.Ct. at 2120; and (2) risk of flight pending the appeal of the order granting the writ.[28] In *Hilton,* the Court noted that the state's interest in this respect is "strongest where the remaining portion of the sentence is long." *Id.* Petitioner was sentenced in 1985 to an aggregate term of forty years with twenty years of parole ineligibility. Hence, the remainder of petitioner's mandatory sentence is more than sufficient to premise an extremely strong State interest in continued incarceration.

The fourth prong of the balancing test, the public interest, also favors the State. Here, petitioner was convicted of crimes indicating that he poses a substantial risk of danger to the community to which he would be returned. Armed robbery is a crime of extreme violence, regardless of the fact that no innocents were injured during its commission. Also, one cannot deny the relevance of the fact that the evidence in the record supporting the verdict of guilt is substantial, to say the least. The likelihood that the state court adjudication resulted in a factually accurate verdict increases the cognizable risk of danger created by ordering the release of a petitioner pending appeal. This consideration is especially appropriate in a case where a petitioner has prevailed on a Speedy Trial Clause claim since *none* of the evidence introduced against him is tainted by the Constitutional infirmity of the conviction. Therefore, the public at large has an acute interest in seeing incarceration continued pending appeal.

The last factor to be considered is the probability of the State's success on the merits of an appeal of this decision. Given the outcome of this proceeding, I cannot say that respondents have a likelihood of success on the merits of an appeal. However, as noted above, the State need only have a "substantial case on the merits" in order to justify a stay. First, the application of the Third Circuit's decision in *Pemberton, supra,* as the basis for finding that petitioner had made a reasonable assertion of his right to a speedy trial is a novel development in the law. Furthermore, the authority of *Schandelmeier,* 819 F.2d at 54, cited above, may be construed as contrary to the application of *Pemberton* in the instant case. The Court of Appeals held in *Schandelmeier* that a petitioner's letters to the state trial court did not suffice as a an assertion of his Sixth Amendments speedy trial rights. The grounds for distinguishing that case from the one at bar are the facts that the letters were not part of the record before the federal court and were deemed insufficient as an assertion of Sixth Amendment rights for purposes of exhausting state remedies—primarily a question of *state* law. *See Schandelmeier,* 819 F.2d at 54 (citing *Commonwealth v. Pounds,* 490 Pa. 621, 629, 417 A.2d 597 (1980); *Commonwealth v. Glover,* 303 Pa.Super. 229, 449 A.2d 662 (1982), *aff'd,* 500 Pa. 524, 458 A.2d 935 (1983)).

27. Although the State has not applied for the stay in this matter, it still occupies the position of the applicant in the *Hilton* balancing test since the grant of a stay would favor its interests. Hence, the State will be considered "the applicant" for the stay for purposes of the balancing analysis.

28. The risk of danger to others in the community incurred by the release of a convicted felon is not an appropriate consideration under the second prong of the test for determining the propriety of a stay. Danger to the public is certainly a factor in determining the public interest prong. Thus, if it were included in the determination of irreparable harm, this factor would be double counted.

The decision could be interpreted, however, to compel the conclusion that petitioner's defectively served and unfiled motions have the same legal effect as Schandelmeier's letters. While I do not consider this interpretation of the decision to be tenable, the issue is, nonetheless, substantial. Moreover, if the issue of the adequacy of petitioner's assertion of the speedy trial right is resolved in favor of the State, the entire balance of the four *Barker* factors will shift in favor of the respondents and the petitioner will have to be denied relief.

In addition, the Fifth Circuit's decision in *Gray v. King*, 724 F.2d 1199 (5th Cir.), *cert. denied*, 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984), is contrary to the legal analysis underlying this case. *Gray* held that credit for time served was deemed sufficient to mitigate the prejudice resulting from ten months of pretrial incarceration. *See* 724 F.2d at 1204. That ruling has been explicitly rejected here. *See* Opinion at 292 n. 23, *supra*. However, the Third Circuit has yet to entertain this issue and the possibility that it would adopt the Fifth Circuit's rule rather than split the circuits leaves respondents with a substantial legal position on appeal.

In light of the vagaries of the Constitutional standards with respect to speedy trial claims and the lack of clarity in the Third Circuit precedents in such cases, the State's case satisfies the "substantiality" requirement. The preceding discussion demonstrates that there are potentially dispositive issues in this case which warrant careful appellate review and which could foreseeably be resolved contrary to their treatment here. Therefore, a stay of the order granting petitioner a writ of habeas corpus is appropriate under the balancing test endorsed in *Hilton*.

Petitioner may, of course, move before the Court of Appeals for dissolution of the stay. In addition, should the State fail to file a timely appeal "within 30 days after the date of entry of the judgment or order appealed from" pursuant to Rule 4 of the Federal Rules of Appellate Procedure, the stay shall automatically dissolve and petitioner shall be discharged immediately from custody. Accordingly, petitioner's application for a writ of habeas corpus is granted, but petitioner shall remain incarcerated pending appeal or dissolution of the stay by the Court of Appeals.

### CONCLUSION

For the foregoing reasons, petitioner's application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 is granted on the ground that the State violated his Sixth Amendment right to a speedy trial. Execution of the writ is stayed pending appeal.